Pacamor Bearings v. Minebea Co.        CV-90-271-SD  03/11/96 P

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


<u>Pacamor Bearings, Inc., et al</u>



       v.                                   Civil No. 90-271-SD


<u>Minebea Co., Ltd., et al</u>



                          O R D E R


     As testament that the modern trend is to litigate on paper

rather than in a courtroom, the court has before it for

consideration plaintiffs' motion for partial summary judgment,

defendants' cross-motion for partial summary judgment,

defendants' objection to the magistrate judge's order quashing a

discovery subpoena, defendants' objection to the magistrate

judge's ruling on document privileges, twelve motions in limine,

and the associated objections (and occasional surreplies)[1]

thereto.  So that this matter may make its final approach to

trial, currently calendared to commence on April 16, 1996, the

court issues the following orders.

_____

       [1]The respective assented-to motions of the parties to file
reply memoranda to the motions in limine, documents 196, 197, are
granted, and such memoranda are herewith docketed as of the date
of this order.

## 1. Background

This civil action involves two bankrupt entities and several of their former competitors in the miniature and instrument ball bearings market. Following numerous pretrial proceedings, the following three claims remain: (1) that defendants violated the Lanham Act, 15 U.S.C. § 1125; (2) that defendants violated New Hampshire's law against unfair trade practices, New Hampshire Revised Statutes Annotated (RSA) 358-A, and/or engaged in unfair competition violative of New Hampshire common law; and (3) that defendants intentionally and improperly interfered with plaintiffs' business relations.

## 2. Plaintiffs' Motion and Defendants' Cross-Motion[2]

Plaintiffs move for summary judgment, as to liability, on their claims that defendants' conduct violated the Lanham Act,

---

[2]The court notes that defendants' objection to plaintiffs' motion is incorporated into their own cross-motion for partial summary judgment. The court further notes that the memoranda filed in conjunction with said motions and objections--44, 40, and 55 pages, respectively--are prolix beyond peradventure and would, under new Local Rule 7.1(3), be refused by the court as excessive by some 19, 15, and 30 pages, respectively. In that the issues raised and argued in the subject papers could most certainly have been addressed with greater brevity, it is unclear to the court whether counsel's actions represent a disdain for the nation's timber reserves, an affinity for the pulp wood market, or an indifference to the fact that there are lawsuits other than the instant one requiring a share of the court's attention.

the New Hampshire Consumer Protection Act, and state common law regarding unfair competition, leaving the "appropriate amount of compensatory damages . . . enhanced and punitive damages, prejudgment interest and attorney fees" for determination by the jury. Plaintiffs' Memorandum of Law at 2. Defendants, by medium of cross-motion, indicate that plaintiffs' Lanham Act claim is unrecognized in this circuit--if characterized as a claim for false advertising--and the state Consumer Protection Act does not include business competitors within the class the Legislature intended to protect. Failing these two arguments, defendants utilize a fall-back position, essentially arguing that genuine issues remain regarding the causal nexus between their alleged conduct and plaintiffs' asserted injury--a purported element of plaintiffs' Lanham Act claim--making summary judgment inappropriate. Because the issues raised in the motion and cross-motion are identical, the court will discuss and resolve same in unison.

a. Summary Judgment Standard

Summary judgment shall be ordered when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. Since the purpose of summary judgment is issue finding, not issue determination, the court's function at this stage "'is

3

not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Stone & Michaud Ins., Inc. v. Bank Five for Savings, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). Although "motions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might some day reveal," Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994), the entire record will be scrutinized in the light most favorable to the nonmovant, with all reasonable inferences indulged in that party's favor, Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994), cert. denied, ___ U.S. ___, 115 S. Ct. 1958 (1995); see also Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994); Maldonado-Denis, supra, 23 F.3d at 581.

"In general . . . a party seeking summary judgment [is required to] make a preliminary showing that no genuine issue of material fact exists." National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)), cert. denied, ___ U.S. ___, 115 S. Ct. 2247 (1995).

> A "genuine" issue is one that properly can be resolved only by a finder of fact because it may reasonably be resolved in favor of either party. Maldonado-Denis, 23 F.3d at 581. In other words, a genuine issue exists "if there

4

> is 'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.'" <u>Id.</u> (quoting <u>Garside [v. Osco Drug, Inc.,</u>] 895 F.2d [46,] 48 [1st Cir. 1990)]. A "material" issue is one that might affect the outcome of the suit under the governing law. <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 248 (1986).

<u>Libertad v. Welch</u>, 53 F.3d 428, 435 (1st Cir. 1995).

"'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve . . . .'" <u>National Amusements</u>, <u>supra</u>, 43 F.3d at 735 (quoting <u>Mack v. Great Atl. & Pac. Tea Co.</u>, 871 F.2d 179, 181 (1st Cir. 1989)). Accordingly, "purely conclusory allegations, . . . rank speculation, or . . . improbable inferences" may be properly discredited by the court, <u>id.</u> (citing <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990)), and "'are insufficient to raise a genuine issue of material fact,'" <u>Horta v. Sullivan</u>, 4 F.3d 2, 8 (1st Cir. 1993) (quoting <u>August v. Offices Unlimited, Inc.</u>, 981 F.2d 576, 580 (1st Cir. 1992)).

   b.  <u>Lanham Act</u>

Citing to precedent deep within the annals of First Circuit jurisprudence, <u>e.g.</u>, <u>Samson Crane Co. v. Union Nat'l Sales, Inc.</u>, 87 F. Supp. 218 (D. Mass.), <u>aff'd</u>, 180 F.2d 896 (1st Cir. 1949)

(per curiam), defendants assert that plaintiffs' false advertising claim is not cognizable by the First Circuit as a proper Lanham Act § 43(a) cause of action.[3] Cf. Camel Hair and Cashmere Inst. v. Associated Dry Goods Corp., 799 F.2d 6, 11 (1st Cir. 1986) ("the dispositive question in determining whether a plaintiff is a proper person to bring a claim under the Lanham Act, is whether the plaintiff has a reasonable interest in being protected against false advertising") (citing Quabaug Rubber Co. v. Fabiano Shoe Co., 567 F.2d 154, 160 (1st Cir. 1977)). Defendants attempt to bolster this assertion by citation to a

---

[3]In its pre-1988-amendment form, which form governs this litigation, section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), provided:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a) (1982).

more recent case out of the circuit, <u>Clamp-All Corp. v. Cast Iron Soil</u>

<u>Pipe Inst.</u>, 851 F.2d 478 (1st Cir. 1988), <u>cert. denied</u>, 488 U.S. 1007 (1989), wherein the panel declined, on the force of plaintiff's failure of proof, to revisit its narrow--and minority--interpretation of section 43(a)'s scope. Reconsideration of its <u>Samson Crane</u> holding was postponed, in the words of the circuit, "for another day." <u>Clamp-All Corp.</u>, <u>supra</u>, 851 F.2d at 491. That day seems to have arrived.

Although this litigation is governed by the pre-1988 amendments to section 43(a), the ensuing change in the statutory language does not compel the court to an alternate ruling.[4]

---

[4]The amended language of section 43(a) now reads,

> (a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person

7

Indeed, the Supreme Court has noted that even under the language of the 1946 enactment the phrase "false description or representation" was construed narrowly to encompass "two kinds of wrongs:  false advertising and the common-law tort of 'passing off.'  False advertising meant representing that goods or services possessed characteristics that they did not actually have and passing off meant representing one's goods as those of another."  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 778 (1992) (Stevens, J., concurring) (footnotes omitted).  Moreover, the 1988 amendments merely served to "codify the interpretations [section 43(a)] has been given by the courts . . . [where] it has been widely interpreted as creating, in essence, a federal law of unfair competition . . . [applicable] to actionable false advertising claims."  S. Rep. No. 100-515, 100th Cong., 2d Sess. 40 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5577, 5603.

Thirteen years ago Judge Selya, then sitting as a district court judge in Rhode Island, limned that "[a] review of the history of the federal trademark legislation, however, leads to the conclusion that Samson Crane's narrow interpretation of § 1125(a) is erroneous, and should not be followed by this court."

who believes that he or she is or is likely to be damages by such act.

15 U.S.C. § 1125(a) (Supp. 1995).

8

Schroeder v. Lotito, 577 F. Supp. 708, 411 (D.R.I. 1983). This mantra has been picked up most recently by Judge Young, from the District of Massachusetts, when he opined, "there is little doubt that the [amended] statute codifies the dominant expansive interpretation of the old statute. In so doing, the amendment has consigned Samson Crane and its progeny to the dustbin of First Circuit jurisprudence." Kasco Corp. v. General Servs., Inc., 905 F. Supp. 29, 34 (D. Mass. 1995) (footnote omitted). The court finds the reasoning of said cases to be persuasive on such issue, and thus finds and rules that plaintiffs' allegations state a valid cause of action for false advertising under section 43(a) of the Lanham Act.[5]

Although this ruling extinguishes that portion of defendants' cross-motion, the court must continue in its inquiry in order to address the merits of plaintiffs' asserted right to judgment in their favor on the issue of liability. To prevail on their claim under section 43(a) of the Lanham Act, plaintiffs must at least show the following three factors: (1) defendants

---

[5]Even if the court were to assume arguendo the continued vitality of the Samson Crane holding, defendants' actions would fall within the scope of conduct prohibited by section 43(a) because the deceitful practices alleged herein directly involve, unlike in Samson Crane, a false description or representation of the goods themselves--DD steel in place of 440C. Accord Schroeder, supra, 577 F. Supp. at 723 (deceitful practices in Samson Crane "involved no false description or representation of the goods themselves").

9

made false or deceptive advertisements and representations to customers; (2) those advertisements actually deceived a significant portion of the consuming public; and (3) plaintiffs were injured by defendants' conduct. See <u>William H. Morris Co. v. Group W, Inc.</u> 66 F.3d 255, 257 (9th Cir. 1995) (per curiam).[6] Insofar as the final prong of either the three-part or the five-part test requires a showing of actual or likely injury to the plaintiffs--a matter more appropriately determined by the jury rather than the court--the court further finds that genuine issues of material fact remain. Accordingly, plaintiffs' motion for partial summary judgment on their section 43(a) claim must be and herewith is denied.

### c. RSA 358-A

Whereas plaintiffs seek judicial acceptance of the RSA 358-A Consumer Protection Act claim, defendants contend that the Act was intended to protect consumers, rather than business

---

[6]The court notes the existence of a similar test involving five factual showings. <u>See, e.g.</u>, <u>Alpo Petfoods, Inc. v. Ralston Purina Co.</u>, 913 F.2d 958, 964 (D.C. Cir. 1990) ("to prevail in a false advertising suit under section 43(a), a plaintiff must prove that the defendant's ads were false or misleading, actually or likely deceptive, material in their effects on buying decisions, connected with interstate commerce, and actually or likely injurious to the plaintiff" (footnote and citations omitted)); <u>U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia</u>, 898 F.2d 914, 922 (3d Cir.) (identifying and analyzing five factors), <u>cert. denied sub nom.</u>, <u>Independence Blue Cross v. U.S. Healthcare, Inc.</u>, 498 U.S. 816 (1990).

competitors, and thus such claim should be ejected from contention.

By its terms, RSA 358-A provides, inter alia, that

> It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state.  Such unfair method of competition or any unfair or deceptive act or practice shall include, but is not limited to, the following:
> . . . .
> V.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . .;
> . . . .
> VII.  Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; . . . .

RSA 358-A:2, V, VII (1995).  Moreover, "[a]ny person injured by another's use of any method, act or practice declared unlawful under this chapter may bring an action for damages and for such equitable relief, including an injunction, as the court deems necessary and proper."  RSA 358-A:10, I.[7]  This court has previously ruled that plaintiffs may maintain an action against defendants based on RSA 382-A:2.  See Order of Jan. 14, 1991, at 27-28.  Defendants ask the court to reconsider such ruling in

_____

[7]The statute ascribes the following meaning to the term "person": "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity."  RSA 382-A:1, I.

11

light of the two state trial court cases appended to their cross-motion.  E.g., Portable Computing Int'l Corp. v. IDG Communications/Peterborough, Inc., No. 90-E-247 (Hillsborough County Super. Ct. Aug. 27, 1990); Thermal Dynamics Corp. v. McGrath, Nos. 85-C-137, 88-C-107 (Grafton County Super. Ct. May 4, 1989).  For the reasons that follow, such request is herewith denied.

As an initial matter, this court has previously held on four distinct occasions that both natural persons and corporations "may avail themselves of the protections and remedies afforded by the Consumer Protection Act."  Nault's Auto. Sales, Inc. v. American Honda Motor Co., 148 F.R.D. 25, 48 (D.N.H. 1993); see also Banke Assocs., Inc. v. New England Fin. Resources, Inc., No. 88-318-D, slip op. at 18-19 (D.N.H. Aug 22, 1989) (applying Act to action between two business entities); Capital Fire Protection Co. v. The Welch Group, No. 89-76-L (D.N.H. May 24, 1989) (holding that "the plain language of the Act appears to permit private actions by corporations both in permitting any person--defined to include corporations--to bring an action, and in its broad definition of the unlawful acts and practices, including any unfair or deceptive act in the conduct of any trade or commerce within New Hampshire."); Adolph Coors Co. v. Globe Distrib., Inc., No. 91-287-S (D.N.H. June 2, 1992) ("corporation, as a 'person' under the Act, can bring a cause of action when

12

'injured by another's use of any method, act or practice declared unlawful' by this Act").

More recently, the New Hampshire Supreme Court has indicated that "the Consumer Protection Act is a comprehensive statute whose language indicates that it should be given broad sweep." Roberts v. General Motors Corp., 138 N.H. 532, 538, 643 A.2d 956, 960 (1994) (citing Gilmore v. Bradgate Assocs., Inc., 135 N.H. 234, 238, 604 A.2d 555, 557 (1992)). A "practice" has been recognized as being "unfair" "if (1) it is '"within at least the penumbra of some common-law, statutory, or other established concept of unfairness,"' (2) '"it is immoral, unethical, oppressive, or unscrupulous,"' or (3) '"it causes substantial injury to consumers."'" Chroniak v. Golden Inv. Corp., 983 F.2d 1140, 1146 (1st Cir. 1993) (quoting Rizzuto v. Joy Mfg. Co., 834 F.2d 7, 8 (1st Cir. 1987) (quoting Purity Supreme, Inc. v. Attorney General, 407 N.E.2d 297, 301 (1980))). Insofar as the alleged violation of the Lanham Act remains in issue, an "unfair" practice within the ambit protected by RSA 358-A:2, the court finds and rules that plaintiffs' "competitor" status does not foreclose resort to the Consumer Protection Act for redress of their asserted injuries. Accord Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., 40 F.3d 492, 497 (1st Cir. 1994) ("The unfair and deceptive practices prohibited by the [Consumer Protection Act] appear to include transactions between business competitors as well as those involving ultimate

13

consumers. There are no provisions which limit the Act's protection to 'ultimate' consumers alone.") (citation omitted), cert. denied, ___ U.S. ___, 115 S. Ct. 2247 (1995). To the extent that defendants' cross-motion argues otherwise, such motion is herewith denied.

That being said, the court is similarly inclined to deny plaintiffs' motion since "'"[w]hether a party has committed an unfair or deceptive act, within the meaning of [the Consumer Protection Act], is a question of fact."'" Curtis Mfg. Co. v. Plasti-Clip Corp., 888 F. Supp. 1212, 1228 (D.N.H. 1994) (quoting Chroniak, supra, 983 F.2d at 1146) (quoting Brennan v. Carvel Corp., 929 F.2d 801, 813 (1st Cir. 1991))) (alteration in original) (other citation omitted).


   d.  Common Law Unfair Competition

"Although the New Hampshire Supreme Court has not defined the exact contours of common-law unfair competition, New Hampshire law does provide that '"a person is liable for unfair competition if he engages in conduct which deceives the general buying public."'" Optical Alignment Sys. & Inspection Servs., Inc. v. Alignment Servs. of N. Am., Inc., 909 F. Supp. 58, 61 (D.N.H. 1995) (quoting Salomon S.A. v. Alpina Sports Corp., 737 F. Supp. 720, 722-23 (D.N.H. 1990) (quoting Jacobs v. Robitaille, 406 F. Supp. 1145, 1151 (D.N.H. 1976))). Thus stated, common law

14

unfair competition "'is a broad equitable doctrine that has evolved in response to predatory business practices and is designed to enforce "increasingly higher standards of fairness or commercial morality in trade."'" Salomon, supra, 737 F. Supp. at 722 (quoting Jacobs, supra, 406 F. Supp. at 1151).

The respective arguments of the parties on this issue bear witness to Judge Bownes's cogent observation that the "legal concept of unfair competition is 'the child of confusion.'" Jacobs, supra, 406 F. Supp. at 1151. "[U]nfair competition is not a unique tort with specific elements, but rather a general category of torts recognized for the protection of commercial interests." Northwest Airlines v. American Airlines, 853 F. Supp. 1110, 1113 n.4 (D. Minn. 1994) (applying Minnesota law) (quotation omitted). "Unfair competition thus does not describe a single course of conduct or a tort with a specific number of elements . . . . The category is open-ended, and nameless forms of unfair competition may be recognized at any time for the protection of commercial values." W. PAGE KEETON, ET AL, PROSSER AND KEETON ON TORTS § 130, at 1015 (5th ed. 1984).

This recognition that unfair competition encompasses an open-ended catalogue of tortious behaviors does not necessarily indicate that such cause of action suffers from unbridled expansiveness or unprincipled judicial linedrawing; especially when traversing its non-statutory--either federal or state--

15

realm. "'Unfair competition,' as known to the common law, is a limited concept. Primarily, and strictly, it relates to the palming off of one's goods as those of a rival trader." A.L.A. Schecter Poultry Corp. v. United States, 295 U.S. 495, 531 (1935) (citations omitted); accord Keebler Co. v. Rovira Biscuit Corp., 624 F.2d 366, 378 (1st Cir. 1980) ("An element essential to common law unfair competition is that the features of a competitor's trade dress that plaintiff asserts are unfairly imitative have acquired a secondary significance, so that the public associates those features with the plaintiff.") (citations omitted) (applying Puerto Rico law); Quabaug Rubber Co., supra, 567 F.2d at 162 (the essence of [the common-law unfair competition] cause of action is the appropriation of a competitor's business to his injury.") (applying Massachusetts law).

Notwithstanding such prior circumscription, the scope of what constitutes "unfair competition" has, over time, been extended. Schecter Corp., supra, 295 U.S. at 532. Moving away from the more narrow prohibitions against the "palming off" of another's goods, "[u]nfairness in competition has been predicated on acts which lie outside the ordinary course of business and are tainted by fraud, or coercion, or conduct otherwise prohibited by law." Id. (footnote omitted). Where, as here, the exact contours of common law unfair competition are yet to be precisely

16

defined by the New Hampshire Supreme Court, <u>Optical Alignment</u>, <u>supra</u>, 909 F. Supp. at 61, this court looks to the provisions of the RESTATEMENT for guidance, "assum[ing] that [the state high court] would follow its provisions in a suit for unfair competition," <u>Jacobs</u>, <u>supra</u>, 406 F. Supp. at 1155.[8]

"Competition," according to Judge Bownes, "is part and parcel of the American way of life and the doctrine of unfair competition should not be used as a means of eliminating or stifling commercial competition." <u>Id.</u> at 1154. That being said, "if a person engages in conduct which causes a fraud to be perpetrated against the buying public, then he should be subject to state law." <u>Id.</u>

As generally applicable here, "[o]ne who, in connection with the marketing of goods or services, makes a representation relating to the actor's own goods, services, or commercial activities that is likely to deceive or mislead prospective purchasers to the likely commercial detriment of another . . . is subject to liability to the other . . . ." RESTATEMENT (THIRD) UNFAIR COMPETITION § 2 (1995). "This Section thus recognizes a

---

[8]Because there already exists a common law right to protection from unfair competition in New Hampshire, with only its parameters left unexplored, the general law of this circuit "that a plaintiff who chooses the federal forum cannot expect a federal court to break new ground in recognizing rights under state law that have not yet been identified by the state's own courts," <u>Penney v. Town of Middleton</u>, 888 F. Supp. 332, 342 (D.N.H. 1994), does not here apply.

general principle of liability for deceptive marketing independent of specific statutory authority." Id. cmt. b. (emphasis added). That is, legislative enactment of consumer protection statutes such as RSA 358-A are recognized as providing supplemental, rather than exclusive, remedies to "[l]iability at common law for acts of unfair competition . . . ." Id., § 1, cmt. g.

The court thus finds and rules that plaintiffs have stated an actionable claim for unfair competition under the common law of New Hampshire. As such, defendants' cross-motion is denied insofar as it posits otherwise. Here again, however, plaintiffs have merely been cleared to take their place at the starting block; the race is yet to be run. Because plaintiffs bear the burden of demonstrating commercial detriment in the alleged unfair competition; that is, "(a) the representation is material, in that it is likely to affect the conduct of prospective purchasers; and (b) there is a reasonable basis for believing that the representation has caused or is likely to cause a diversion of trade from the other or harm to the other's reputation or good will," id., § 3, a fact-sensitive inquiry better suited to determination after trial by jury, the court

18

further denies plaintiffs' motion for partial summary judgment as to common-law unfair competition.[9]

3. Plaintiffs' Motion in Limine (DD Steel Testing and S/N Precision), document 162

This motion seeks to bar (1) any evidence pertaining to material testing performed upon the DD steel bearings subsequent to the initiation of this lawsuit and (2) any evidence regarding the business performance or corporate organization of the firm S/N Precision.

_____

[9]The rulings made herein are further ordered to apply to all plaintiffs and defendants included in the caption, the court finding that (1) Pacamor has not waived its standing to sue under the Lanham Act for defendants' sales to customers other than the Department of Defense and (2) defendants, having previously argued their interconnectedness, may not now disavow such corporate arrangement in order to partition liability. Defendants' arguments relative to the proper statute of limitations is an attempt to limit the damages awarded, if any, rather than a merits-based challenge, and is more elaborately raised in one of the twelve pending motions in limine. Resolution of such issue, therefore, is addressed infra.

Invoking the provisions of Rules 402[10] and 403,[11] Fed. R. Civ. P., plaintiffs move in limine to bar the introduction of any evidence concerning the testing of DD steel manufactured post-complaint.

The "consequential facts"[12] in this litigation are those concerning (1) the liability, if any, of the defendants and (2) if liability of the defendant is proven, the amount of damages to be awarded as a result thereof. Plaintiffs' claims arise from defendants' alleged false representations concerning the content of their ball bearings introduced into the United States market between 1985 and 1989. Tests of currently manufactured DD steel bearings are not such "consequential facts," and, accordingly, the motion in limine is herewith granted as to said issue.[13]

---

[10]Rule 402, Fed. R. Evid., provides that "[a]ll relevant evidence is admissible, [and] . . . [e]vidence which is not relevant is not admissible."

[11]Rule 403, Fed. R. Evid., provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[12]Rule 401, Fed. R. Evid., provides, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[13]Indeed it is true that, as defendants assert, "dissimilarities between experimental and actual conditions affect the weight, not the admissibility, of the evidence."

Plaintiffs further seek to bar the introduction of any evidence relating to S/N Precision, "a separate corporation, separate ownership and capitalization with a separate board of directors, which purchased the assets of Pacamor and Kubar [including the tradenames]." Plaintiffs' Motion in Limine at 6. Such assets were purchased at the bankruptcy action by Augustine Sperrazza, the former president of Pacamor and Kubar and current president of S/N Precision. Plaintiffs assert that since "S/N Precision was not even in existence during the time period involved in this lawsuit and has no claim or interests in its outcome," id. at 7, any evidence relating to said corporation is not a "consequential fact" in the litigation.

Defendants counter that evidence relating to S/N Precision is relevant, not to liability, but to damages. "Despite the fact that they seek damages for loss of the purported value of Pacamor and Kubar in January 1991, plaintiffs' motion would prevent the jury from hearing that Mr. Sperrazza (who owned Pacamor and Kubar) has, with his family, formed a new corporation called S/N Precision, purchased Kubar's assets, and continued operations in

Bonilla v. Yamaha Motors Corp., 955 F.2d 150, 155 (1st Cir. 1992) (citing Robbins v. Whelan, 653 F.2d 47, 49 (1st Cir.), cert. denied sub nom., Whelan v. Robbins, 454 U.S. 1123 (1981)). The content of the ball bearings at issue, however, is not a condition of experimentation.

21

the same location under the Pacamor-Kubar name." Defendants' Objection at 6.

Defendants served a third-party subpoena upon S/N Precision in November 1995. Subsequent to motion, objection, and argument to the magistrate judge seeking to quash the deposition subpoena, Magistrate Judge Muirhead granted S/N Precision's motion to quash. Defendants have moved this court to reconsider the magistrate judge's ruling, which is among the motions pending before the court. The court defers ruling on the motion in limine as to S/N Precision until its discussion regarding the propriety of the magistrate judge's decision to quash the third-party subpoena.

## 4. Plaintiffs' Motion in Limine (Equivalence Defense), document 163

Plaintiffs move in limine "to prohibit the Defendants from any offer of evidence or argument that DD [steel] was equivalent or superior to AISI 440C," Plaintiffs' Motion in Limine at 5, as a defense to alleged misrepresentations prior to the 1989 disclosure. Plaintiffs further seek an order limiting such proof of "equivalence" solely to alleged misrepresentations made in and subsequent to 1989.

Noting that "[e]vidence of DD steel's equivalence or superiority is relevant to Plaintiffs' claims that Defendants

22

allegedly made misrepresentations regarding the steel used by their overseas plant, whether the alleged misrepresentations were made before or after February 1989," Defendants' Objection at 2, defendants assert that the instant motion in limine is "merely a request that the jury should be directed to ignore that evidence for the period prior to . . . February 1989," id. at 1-2. Defendants further assert that "[e]vidence of DD steel's equivalence or superiority to 440C steel shows that Defendants' alleged misrepresentations regarding the steel they were using could not have been material to the average consumer . . . [and] were in fact true from the customer's viewpoint." Id. at 2.

A plaintiff asserting a false advertising claim under the Lanham Act "must demonstrate that the defendant's advertisements are either literally false or are misleading to the consuming public." Compaq Computer Corp. v. Packard Bell Electronics, 163 F.R.D. 329, 336 (N.D. Cal. 1995) (citing Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 228-29 (3d Cir. 1990)) (footnote omitted). Whereas "the determination whether an advertising claim is misleading to consumers is evaluated from the public's perspective," id., courts evaluate claims of "literal falsity" according to objective industry standards "'without reference to consumer confusion,'" id. (quoting Castrol, Inc. v. Pennzoil Co., 987 F.2d 939, 947 (3d Cir. 1993)). At all times, however, "plaintiff bears the burden of proving

23

literal falsity . . . ." BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1091 (7th Cir. 1994).

Defendants' product literature has evolved over the time period at issue, initially identifying the stainless steel material used as "AISI 440C", see NHBB Miniature and Instrument Precision Ball Bearings catalogue, Bates Stamp 115517 (attached as Exhibit 13 to Defendants' Objection), but subsequently identifying same as a "400 series stainless steel," see NHBB Ball Bearing Products, Short Form Catalogue, Bates Stamp 102400 (attached as Exhibit A to Defendants' Objection). At least insofar as the catalogue indicates the steel to be used is AISI 440C, if DD steel was substituted, then such representation is literally false. See Castrol, supra, 987 F.2d at 944 ("if a defendant's claim is untrue, it must be deemed literally false").

Plaintiff's motion is thus granted. Defendants are precluded from offering any proof as to equivalence, or superiority, of DD steel to 440C when they were marketing their bearings as composed of AISI 440C steel.[14] Defendants'

_____

[14]The representation regarding "400 series stainless steel" is an area where equivalence evidence may be appropriate, since if DD steel's characteristics are such that it may be categorized in the 400 series, such representation is not "literally false." It may, however, prove susceptible to the alternate § 43(a) prong of "consumer confusion." This issue has not been briefed and thus is not properly before the court.

equivalence evidence will be allowed as a defense to the post-February 1989 marketing of the DD steel bearings.

5. Plaintiffs' Motion in Limine (ITC Determination), document 164, and Defendants' Motion in Limine (Tariff Act findings), document 166

Plaintiffs' motion in limine seeks to make binding on this court the final determinations of the International Trade Commission that defendants imported and sold ball bearings at less than fair value in violation of the Tariff Act of 1930, 19 U.S.C. § 1303, et seq. Defendants correspondingly move in limine for an order prohibiting the introduction of the government's findings under said Act into the evidence.

In a prior order, the court granted defendants' motion for partial summary judgment as to plaintiffs' state-law claims "based on allegations of international price discrimination or illegal international pricing in violation of the Anti-Dumping Act." Pacamor Bearings, Inc. v. Minebea Co., 892 F. Supp. 347, 355 (D.N.H. 1995). However, the court further noted that "[t]o the extent that plaintiffs' state law claims are based on other illegal conduct, said claims survive defendants' present motion." Id.

Recognizing that the Tariff Act does not provide a private right of action, plaintiffs seek to utilize the findings of the

25

International Trade Commission to bolster their state-law claims; namely, to show that defendants engaged in conduct "which is predatory, unfair and anti-competitive . . . ." Plaintiffs' Motion at 2 n.1. Plaintiffs assert that the First Circuit has "expressly held that ITC determinations have preclusive effect on subsequent litigation." Id. at 8 (citing Aunyx Corp. v. Canon U.S.A., Inc., 978 F.2d 3, 7 (1st Cir. 1992), cert. denied, 507 U.S. 973 (1993); Union Mfg. Co. v. Han Baek Trading Co., 763 F.2d 42, 45-46 (2d Cir. 1985)).

Upon review of such cases, the court generally concurs in plaintiffs' characterization of this Circuit's precedent. The First Circuit has accorded ITC determinations res judicata effect. See Aunyx Corp., supra, 978 F.2d at 7 (citing Union Mfg. Co., supra, 763 F.2d at 45-46). However, neither the Anti-Dumping Act nor the Tariff Act is a viable claim in this litigation subject to preclusion. Moreover, the only ITC findings possibly relevant to this suit are those concerning their countervailing duty investigation pursuant to 19 U.S.C. § 1303,[15] which section the First Circuit has not endorsed as entitled to preclusive effect in subsequent proceedings. See Aunyx Corp., supra, 978 F.2d at 7 (adopting Second Circuit

_____

[15]The other ITC findings related to the Anti-Dumping Act, 19 U.S.C. § 1673d(b), a claim plaintiffs earlier withdrew. See Pacamor Bearings, supra, 892 F. Supp. at 355.

26

holding that "ITC decisions in <u>Section 337 proceedings</u> are entitled to *res judicata* effect") (emphasis added) (citation omitted).

Insofar as the First Circuit has yet to state its position as to section 303 proceedings, in conjunction with this court's determination that any such evidence would either tend to cause confusion of the litigated issues and/or be more prejudicial than probative, the court herewith denies plaintiffs' motion in limine and grants that of defendants. The ITC findings relative to countervailing duties are not relevant to plaintiffs' remaining causes of action, and thus are barred from being introduced at trial.

## 6. Defendants' Motion in Limine (Extra-New Hampshire Conduct), document 165

Defendants seek to bar the introduction of any evidence relative to conduct without the borders of New Hampshire as part of plaintiffs' claim under the state Consumer Protection Act, RSA 358-A:2. In sum, "[p]laintiffs have no basis to argue that acts outside the state or sales to out-of-state customers caused injury within the state or affected the people of New Hampshire." Defendants' Motion at 3.

Pursuant to the Act, "It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive

act or practice in the conduct of any trade or commerce within this state."  RSA 358-A:2.  Seizing on the "within this state" language of the statute, defendants argue that "the only evidence that is relevant to Plaintiffs' Consumer Act claim is that which concerns (1) NHBB bearings manufactured in New Hampshire and (2) sales by NMB Corp. to customers located in New Hampshire." Defendants' Motion at 4.

The court has been unable to identify any caselaw, either state or federal, interpreting this specific provision of RSA 358-A:2.  However, other courts interpreting similar language have found that the "'in this state' [language] clearly indicates that the statute is only applicable if the offending conduct took place within the territorial borders of the state . . . ." Shorter v. Champion Home Builders Co., 776 F. Supp. 333, 339 (N.D. Ohio 1991) (emphasis added).  Thus, irrespective of the locus of the manufacturer or supplier, "it is the activity . . . that is determinative."  Id. (construing the holding of Brown v. Market Dev., Inc., 322 N.E.2d 367, 369 (Ohio Common Pleas Ct. 1974)).

NHBB conducts its business in New Hampshire.  Part of that business is the sale of bearings imported by NMB Corp.  Moreover, NHBB is an integral component part of the Minebea corporate empire.  That this lawsuit pertains to fraudulent conduct allegedly known and perpetuated by a business within the borders

28

of the state satisfies the statutory locality prerequisite notwithstanding the limited amount of direct sales to New Hampshire customers.  It is the "offending conduct" that must occur within the state--the "unfair method of competition or any unfair or deceptive act or practice" in trade or commerce--not the actual sale.  Defendants' motion in limine is accordingly denied.

7.   Defendants' Motion in Limine (Pricing Evidence),
document 167.1, 167.2

Defendants move in limine to preclude any evidence of their ball bearings pricing scheme.  In the alternative, defendants seek to dismiss plaintiffs' predatory pricing claims as unrecognized under RSA 358-A:2 and New Hampshire common law.

Plaintiffs seek the introduction of pricing evidence not to substantiate a pricing discrimination claim per se--as under the Clayton or Robinson-Patman Acts--but rather to demonstrate that defendants' manner of competition included practices that were unfair.  As such, and contrary to defendants' assertion otherwise, antitrust law does not provide "the only available barometer," Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield, 883 F.2d 1101, 1114 (1st Cir. 1989), cert. denied, 494 U.S. 1027 (1990), by which defendants' "conduct can

be found to be 'wrongful' or 'illegitimate' . . . and hence, tortious," id.[16]

To the extent that the cases cited by defendants in support of their argument rely on antitrust theories not here advanced, they are inapposite to the current inquiry. The issue is whether plaintiff may introduce evidence of defendants' pricing in order to substantiate the state law unfair competition claims; claims that find their genesis in "predatory, intentional and illegal pricing practices [which] demonstrate anti-competitive, rather than competitive, practice." Plaintiffs' Objection at 14. Such evidence will be permitted, the strength of which to be tested through adequate and proper cross-examination by defendants' able counsel.

Accordingly, defendants' motion in limine/alternative motion for summary judgment is denied.

---

[16]The court does note, however, that elements of plaintiffs' unfair competition claim may indeed be similar to the essence of an antitrust claim: "A business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market." Brook Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, ___, 113 S. Ct. 2578, 2587 (1993).

8.  Defendants' Motion in Limine (ABEC Classification),
document 168

Defendants seek to exclude "all evidence regarding any alleged misrepresentations to the United Customs Service regarding the Annular Bearing Engineers' Committee ("ABEC") classifications of bearings sold by Defendants."  Defendants' Motion at 1.  Such evidence is "too remotely related" to plaintiffs' allegations to support a claim "that Defendants' customs declarations were intended to price Plaintiffs or any other competitors out of the market."  Id. at 4 (footnote omitted).  Moreover, defendants continue, the possible relevance of this evidence is more than outweighed by the "complexity and confusion which the ABEC issue generates."  Id. at 5.

Plaintiffs concede "the ABEC fraud may not be part of the Lanham Act claim, but it is unlawful conduct which fits within the Plaintiffs' broad-based and multi-faceted common law claim."  Plaintiffs' Objection at 7 (emphasis added).  Plaintiffs' unfair competition claim seeks to hold defendants liable for a variety of unfair practices and methods of competition.  The ABEC evidence is, in the view of the court, relevant to the issues raised by such claim, and the jury is entitled to hear same.  Defendants' motion is thus denied.

## 9. Defendants' Motion in Limine (Statute of Limitations), document 169

Defendants seek an order barring plaintiffs from offering into evidence any conduct on defendants' part that occurred outside the applicable statute of limitations period for each of the unfair competition claims alleged. Since this lawsuit was commenced on June 15, 1990, defendants seek to limit the evidentiary window to the two- or three-year period preceding such date.[17]

Although plaintiffs' ability to obtain relief upon their claims is limited to damages flowing from June 15, 1987 (for the common law and Lanham Act claims) and June 15, 1988 (for the Consumer Protection Act claim), this does not entail a bar to introducing evidence of conduct prior to such dates. Indeed, RSA 358-A:3, IV-a, specifically states "this section shall not ban the introduction of evidence of unfair trade practices and deceptive acts prior to the 2 year period in any action under this chapter." Thus evidence of conduct prior to the outer limit of the limitations window is permissible. However, since the

---

[17]RSA 358-A:3, IV-a, sets a two-year "exempt transaction" period limiting actions under the Consumer Protection Act to those taking place no more than two years prior to the filing of the complaint. As to the Lanham Act and common-law claims, the court finds these actions most akin to those sounding in fraud, to which the state's three-year limitations statute applies, RSA 508:4, and thus pushes the window of recovery on those claims to June 15, 1987.

32

plaintiffs' claims are founded upon conduct taking place no earlier than 1984, the court finds that such date defines the period of relevancy to the instant allegations. See Freund v. Fleetwood Enters., Inc., 956 F.2d 354, 360 (1st Cir. 1992).

Accordingly, notwithstanding the limitations period of two or three years applicable to plaintiffs' varied causes of action, the limitation, as such, is relative only to their permissible window of compensable recovery, not evidentiary submissions. The evidence in this lawsuit will be confined to the period of time running from 1984. Defendants' motion in limine is thus granted in part and denied in part.

10. Defendants' Motion in Limine (Relabeling), document 170

Defendants seek to preclude plaintiffs "from presenting evidence in support of their allegations that Defendants 'relabeled' imported product and sold it as domestically produced product." Defendants' Motion at 1. The basis for such motion is that much of the evidence (1) concerns acts undertaken outside the relevant limitations period, (2) is not probative of any actual misrepresentations by defendants, (3) is overly speculative, and (4) constitutes improper opinion testimony. Id. at 1-2.

The court has previously ruled that the statute of limitations serves as a bar to recovery in damages, not to the

33

introduction of evidence in this matter.  On the record before it, the court cannot evaluate the merits of defendants' remaining arguments, and will make rulings on such evidence in the context of the trial testimony.  As such, defendants' motion is denied.

11.  Defendants' Motion in Limine (Damages Expert), document 171

This motion seeks to preclude plaintiffs' proposed damages expert, Professor Colin C. Blaydon, from testifying in this litigation.

"Determinations of whether a witness is sufficiently qualified to testify as an expert on a given subject and whether such expert testimony would be helpful to the trier of fact are committed to the sound discretion of the trial court." Espeaignnette v. Gene Tierney Co., 43 F.3d 1, 10-11 (1st Cir. 1994) (citing Navarro de Cosme v. Hospital Pavia, 922 F.2d 926, 931 (1st Cir. 1991)).  The trial judge's ruling "'in this sphere [will] be upheld "unless manifestly erroneous."'"  Id. at 11 (quoting United States v. Sepulveda, 15 F.3d 1161, 1183 (1st Cir. 1993) (quoting Salem v. United States Lines Co., 370 U.S. 31, 35 (1962)), cert. denied, ___ U.S. ___, 114 S. Ct. 2714 (1994).

"Rule 702 consists of three distinct but related requirements," United States v. Shay, 57 F.3d 126, 132 (1st Cir.

34

1995),[18] which are intended to guide the trial judge in ensuring "'that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand,'" Vadala v. Teledyne Indus., Inc., 44 F.3d 36, 39 (1st Cir. 1995) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., ___ U.S. ___, ___, 113 S. Ct. 2786, 2799 (1993)).  In order to properly effectuate the

> "gatekeeping function" contemplated by Rule 702[,] . . . the trial judge [is essentially required] to assess whether it is *reasonably likely* that the expert possesses specialized knowledge which will assist the trier better to understand a fact in issue." Sepulveda, [supra], 15 F.3d at 1183 (citing Daubert, [supra], ___ U.S. ___, 113 S. Ct. 2786) (emphasis added); Apostol v. United States, 838 F.2d 595, 599 (1st Cir. 1988) (noting that Rule 702 rulings invite a "case-specific inquiry").

United States v. Alzanki, 54 F.3d 994, 1005-06 (1st Cir. 1995), cert. denied, ___ U.S. ___, 116 S. Ct. 909 (1996).

> The fundamental question that a court must answer in determining whether a proposed expert's testimony will assist the trier of fact is "'[w]hether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a

---

[18]"[A] proposed expert witness must be qualified to testify as an expert by 'knowledge, skill, experience, training, or education[,]' . . . the expert's testimony must concern 'scientific' technical or other specialized knowledge[,]' . . . [and] the testimony must 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" Shay, supra, 57 F.3d at 132 (quoting Rule 702, Fed. R. Evid.) (other citations omitted).

> specialized understanding of the subject
> matter involved.'"

Shay, supra, 57 F.3d at 132 (quoting United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994), cert. denied sub nom., Felix-Montas v. United States, ___ U.S. ___, 115 S. Ct. 1986 (1995) (quoting Rule 702, Fed. R. Evid., advisory committee's notes), cert. denied, ___ U.S. ___, 115 S. Ct. 1986 (1995))) (other citations omitted). "Unless the witness's opinions are informed by expertise, they are no more helpful than the opinions of a lay witness . . . [and thus] cannot be admitted pursuant to Rule 702 and instead must comply with the requirements of Fed. R. Evid. 701 governing the admissibility of opinion testimony by lay witnesses." Id. at 133 (citing United States v. Jackman, 48 F.3d 1, 4-5 (1st Cir. 1995)).

The Federal Rules of Evidence contemplate that a qualified expert must be allowed to testify with "'the full burden of exploration of the facts and assumptions underlying [his testimony placed] squarely on the shoulders of opposing counsel's cross-examination.'" Newell v. Puerto Rico, Ltd. v. Rubbermaid, Inc., 20 F.3d 15, 20 (1st Cir. 1994) (quoting International Adhesive Coating Co. v. Bolton Emerson Int'l, Inc., 851 F.2d 540, 544-45 (1st Cir. 1988)). "'[T]he fact that an expert's testimony may be tentative or even speculative does not mean that the testimony must be excluded so long as opposing counsel has an

36

opportunity to attack the expert's credibility.'" Id. at 21 (quoting International Adhesive Coating Co., supra, 851 F.2d at 544) (citations omitted in Newell).

If upon presentation of direct and cross examination of Professor Blaydon it appears that "the opinions advanced . . . rest on a wholly inadequate foundation, the judge, on timely motion, may strike the testimony." Sepulveda, supra, 15 F.3d at 1183 (citations omitted). However, "'[w]hen the factual underpinning of an expert opinion is weak, it is a matter affecting the weight and credibility of the testimony--a question to be resolved by the jury.'" Newell, supra, 20 F.3d at 21 (quoting International Adhesive Coating Co., supra, 851 F.2d at 544).

The court has reviewed defendants' evidence in support of the motion in limine and finds such to address the weight and/or credibility of plaintiffs' proposed expert testimony rather than the admissibility of same *qua* expert opinion. Accordingly, the motion in limine is herewith denied.


12. Defendants' Motion in Limine (Lost Sales), document 172

Asserting that plaintiffs' damages claim is "unreasonably speculative and without factual basis," Defendants' Motion at 1, defendants seek to exclude all evidence of sales allegedly lost by plaintiffs to defendants.

37

Defendants essentially seek a ruling requiring plaintiffs to identify, on a one-for-one basis, each and every sale lost to defendants that otherwise would have been a sale to plaintiffs but for the impermissible conduct alleged. This argument overstates what the Lanham Act requires; the fifth element of plaintiffs' claim only requires proof that defendants' conduct was "actually or likely injurious" to the plaintiffs. See Alpo Petfoods, supra, 913 F.2d at 964 (emphasis added).

To be sure, "damages may not be purely speculative," BASF Corp., supra, 41 F.3d at 1095; however, "a factfinder may 'make a just and reasonable estimate of the damage based on relevant data' and may 'act upon probable and inferential, as well as direct and positive[,] proof,'" id. (quoting Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946)) (quotation and other citation omitted). Minimization of the damages awarded, if any, is not properly achieved via a global exclusion of lost sales evidence prior to trial. Rather, such reduction is a matter for the defendants to persuasively argue to the jury by means of counterevidence demonstrating that plaintiffs' purported injuries were "attributable to . . . causes" other than the defendants' alleged impermissible business practices.

Defendants' motion in limine is accordingly denied.

## 13. Defendants' Motion in Limine (James E. Papapietro), document 174

Having been designated as an expert by plaintiffs on December 29, 1995, defendants seek to have the testimony of James E. Papapietro excluded from trial as untimely disclosed. If plaintiffs' expert is permitted to be called, defendants have designated Robert H. Buck as a rebuttal witness. Plaintiffs object to both the motion to exclude Mr. Papapietro and the designation of Mr. Buck.

The Federal Rules of Civil Procedure "provide for extensive pretrial disclosure of expert testimony." Thibeault v. Square D Co., 960 F.2d 239, 244 (1st Cir. 1992). Such disclosure is "consonant with the federal courts' desire to 'make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent.'" Id. (quoting United States v. Proctor & Gamble Co., 356 U.S. 677, 682 (1958)) (emphasis added). Rule 26(a)(2)(B), Fed. R. Civ. P., requires parties to disclose their experts before trial and to provide the opposing party a written report, prepared and signed by the expert witness, containing a complete statement of all opinions to be expressed by the expert and the basis and reasons therefor.

The discovery schedule in this matter contemplated March 31, 1994, as the date by which all expert witnesses were to be

disclosed. Admittedly untimely, plaintiffs assert that the late disclosure of Mr. Papapietro was due, in large part, to defendants' delays in producing requested discovery materials. Specifically, plaintiffs assert "[t]hey have never had the type of information (i.e. steel purchase orders, import logs, component transfer records, transaction reports, etc.) which could be used by an expert to actually calculate the number of 100% domestic ball bearings that defendants were capable of producing at Chatsworth." Plaintiffs' Objection at 3.

As previously noted, this matter is scheduled for trial commencing on April 16, 1996. Defendants correctly indicate that the prospect of deposing plaintiffs' expert and locating a rebuttal witness of their own is an unenviable situation given the proximity of the trial date. However, defendants provide no reason why they waited for over one month's time before objecting to the designation of Mr. Papapietro, while offering the conditional designation of Mr. Buck within two days of plaintiffs' disclosure.

Given the extensive delays and proclivity for protraction which has characterized this litigation to date, the court finds and rules that plaintiffs' disclosure of Mr. Papapietro will be permitted, notwithstanding the expiration of the disclosure period. The court recognizes that little more than five weeks remain before trial, and this ruling will indeed place an added

40

burden on the parties as they prepare for such trial, but the circumstances of this litigation compel such result. In all events, this matter of the supplemental experts shall be resolved--depositions and all--prior to the date of the final pretrial conference, currently scheduled for April 1, 1996.[19]

As to Mr. Buck, the court finds that, as currently indicated, his testimony relates to issues or matters that will not be addressed by Mr. Papapietro. Compare Plaintiffs' Supplemental Identification of Experts (attached to Plaintiffs' Objection as Exhibit A) (witness to testify to "a) the Manufacturing process [at] the Chatsworth facility; b) the capacity at the Chatsworth facility; c) the assembly process at Chatsworth including but not limited to the assembly and assembly related manpower requirements; d) the number of units of M+I ball bearings produced from raw material") with Defendants' Conditional Supplemental Designation of Expert Witness (attached to Plaintiffs' Objection as Exhibit B) (witness "will opine regarding the market for M&I bearings in the mid-1980's, the competitive environment facing plaintiffs at that time,

_____

[19]The court further notes plaintiffs' current indecision regarding whether they will call Mr. Papapietro as a "testifying expert or non-testifying consultant," Plaintiffs' Objection at 1 n.1, and their further indication that a decision on said matter will be forthcoming "on or before March 20, 1996." Id. It would appear to be in the interest of all parties that the plaintiffs make such decision sooner, rather than later.

41

plaintiffs' position in the market, the inaccurate assumptions on which plaintiffs' plans were made, and the inadequacies and lack of viability of the 1987 Business Plan"). Insofar as this testimony does not appear to be in rebuttal to that of Mr. Papapietro, such supplemental designation will be disallowed. Should defendants wish to offer a true rebuttal witness, such disclosure should be promptly made, and any required depositions should occur prior to the April 1, 1996, final pretrial conference.

## 14. Defendants' Objection to Magistrate Judge's Ruling (S/N Precision), document 192

On February 6, 1992, Magistrate Judge Muirhead granted S/N Precision Enterprises, Inc.'s motion to quash defendants' discovery subpoena. He found after review of the letter briefs, supplemental briefs, and other addenda submitted on the issue that

> [d]espite the many similarities of Kubar/Pacamor and S/N Precision, they simply are not the same entity. Kubar was liquidated in bankruptcy. Much of the information sought is confidential financial information. It is sought to counteract a theory of damages which has not even been advanced by plaintiffs. Defendants have failed to show a substantial need for the requested discovery as required by Fed. R. Civ. P. 45(c)(3)(B). The discovery period of five years is over. The motion to quash the subpoena is granted.

Order of February 6, 1996, at 2.  Defendants move, pursuant to Rule 72, Fed. R. Civ. P.,[20] for reconsideration of such ruling.

The power of the district court to reconsider a matter so decided by the magistrate judge is limited to those circumstances 'where it has been shown that the magistrate's order is <u>clearly erroneous or contrary to law.</u>"  <u>Rubin v. Smith</u>, 882 F. Supp. 212, 215 (D.N.H. 1995) (quoting 28 U.S.C. § 636(b)(1)(A)).  "'A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  <u>Id.</u> (quoting <u>United States v. United States Gypsum Co.</u>, 333 U.S. 364, 395 (1948)).

Finding defendants' motion for reconsideration to be without legal merit, it is herewith denied.  Similarly, defendants have failed to persuade the court that evidence regarding S/N Precision is relevant to plaintiffs' claims or damages in a manner that would not cause prejudice unfairly outweighing its

---

[20]Rule 72, Fed. R. Civ. P., provides, in pertinent part,

> Within 10 days after being served with a copy of the magistrate judge's order, a party may serve and file objections to the order; a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made.  The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law.

probative value. S/N Precision is neither the alter ego nor a successor corporation to the plaintiff entities, which were liquidated in bankruptcy proceedings. Accordingly, the court further grants plaintiffs' motion in limine relative to evidence pertaining to S/N Precision.

## 15. Defendants Objection to Magistrate Judge's Ruling (Privileged Documents), document 193

Rule 26(b)(6), Fed. R. Civ. P., provides,

> When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

Defendants claim the documents herein at issue are protected by one of two legal privileges: attorney-client and work-product.

### a. The Attorney-Client Privilege

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981) (citing 8 J. WIGMORE, EVIDENCE § 2290 (McNaughton rev. 1961)). The privilege "'protects confidential disclosures made by a client to

44

an attorney in order to obtain legal advice,' as well as an attorney's advice in response to such disclosures." In re Grand Jury Investigation, 974 F.2d 1068, 1070 (9th Cir. 1992) (citations omitted); see also Upjohn, supra, 449 U.S. at 390 ("the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."); United States v. Billmyer 57 F.3d 31, 36 (1st Cir. 1995) ("the privilege is primarily designed to protect communications *by the client* to the lawyer in order to procure legal advi[c]e.").

It is widely recognized that the purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn, supra, 449 U.S. at 389; Texaco Puerto Rico, Inc. v. Department of Consumer Affairs, 60 F.3d 867, 883 (1st Cir. 1995).

The party asserting the attorney-client privilege has the burden of proving that the privilege protects the documents or communications in question. Town of Norfolk v. U.S. Army Corps of Engineers, 968 F.2d 1438, 1457 (1st Cir. 1992); United States v. Bay State Ambulance and Hosp. Rental Serv., Inc., 874 F.2d 20, 28 (1st Cir. 1989). In order to meet this burden,

45

> the person asserting the privilege is
> required to make four showings: (1) that
> he was or sought to be a client of [the
> attorney]; (2) that [the attorney] in
> connection with the [document] acted as a
> lawyer; (3) that the [document] relates
> to facts communicated for the purpose of
> securing a legal opinion, legal services
> or assistance in a legal proceeding; and
> (4) that the privilege has not been
> waived.

Bay State Ambulance, supra, 874 F.2d at 27-28 (quoting United

States v. Wilson, 798 F.2d 509, 512 (1st Cir. 1986)).[21]

Further, in this circuit, "[t]he guiding principle in

determining whether or not there exists a privileged attorney-

client relationship is the intent of the client." Kevlik v.

Goldstein, 724 F.2d 844, 849 (1st Cir. 1984). Thus, "[t]he key

question in determining the existence of a privileged

communication is 'whether the client reasonably understood the

---

[21]The elements of the attorney-client privilege have also
been broken down as follows:

> "(1) where legal advice of any kind is sought
> (2) from a professional legal adviser in his
> capacity as such, (3) the communications
> relating to that purpose (4) are made in
> confidence (5) by the client, (6) are at his
> instance permanently protected (7) from
> disclosure by himself or by the legal
> adviser, (8) except the protection be
> waived."

Fromson v. Antitec Printing Plates, Inc., 152 F.R.D. 2, 3 (D.
Mass. 1993) (quoting Glaxo, Inc. v. Novopharm Ltd., 148 F.R.D.
535, 538 (E.D.N.C. 1993) (quoting 8 J. WIGMORE, EVIDENCE § 2292
(MacNaughton rev. 1961))).

46

conference to be confidential.'" Id. (quoting MCCORMICK ON EVIDENCE § 91, at 189 (1972)).

Since the attorney-client privilege "has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." Fisher v. United States, 425 U.S. 391, 403 (1976); see also Fleet Nat'l Bank v. Tonneson & Co., 150 F.R.D. 10, 13 (D. Mass. 1993) ("Because the attorney-client privilege can and often does seriously impede the search for truth in a particular case, courts are naturally reluctant to extend it beyond the narrowest limits required to achieve its purpose of fostering effective attorney-client communication."). "Accordingly it protects only those disclosures--necessary to obtain informed legal advice--which might not have been made absent the privilege." Fisher, supra, 425 U.S. at 403 (citations omitted).

The party asserting that a document is protected by the attorney-client privilege has the burden of showing "that the [document] relates to facts communicated for the purpose of securing a legal opinion, legal services or assistance in a legal proceeding . . . ." Bay State Ambulance, supra, 874 F.2d at 27-28 (quoting Wilson, supra, 798 F.2d at 512). Accordingly, "a number of courts have determined that the attorney-client privilege does not protect client communications that relate only to business or technical data." Simon v. G.D. Searle & Co., 816

47

F.2d 397, 403 (8th Cir.) (citing cases), cert. denied, 484 U.S. 917 (1987); see also Winchester Capital Management Co. v. Manufacturers Hanover Trust Co., 144 F.R.D. 170, 175 (D. Mass. 1992) (communications made for the purpose of obtaining business advice rather than legal advice are not privileged). However, "[c]lient communications intended to keep the attorney apprised of business matters may be privileged if they embody 'an implied request for legal advice based thereon.'" Simon, supra, 816 F.2d at 404 (quoting Jack Winter, Inc. v. Koratron Co., 54 F.R.D. 44, 46 (N.D. Cal. 1971)).

Closely related to the requirement that communications be made for the purpose of securing legal advice in order to be privileged, is the requirement that the attorney act as a lawyer in connection with the document. E.g., Texaco Puerto Rico, supra, 60 F.3d at 884 ("The attorney-client privilege attaches only when the attorney acts in that capacity."). Thus, "[b]usiness advice, such as financial advice or discussion concerning business negotiations, is not privileged." North Carolina Elec. Membership Corp. v. Carolina Power & Light Co., 110 F.R.D. 511, 517 (M.D.N.C. 1986) (citations omitted); see also Sneider v. Kimberly-Clark Corp., 91 F.R.D. 1, 4 (N.D. Ill. 1980) (counsel must be "involved in a legal, not business capacity" for the privilege to apply).

Several documents claimed by defendants to be privileged are letters, memoranda, or facsimile transmissions with attachments. "Attachments which do not, by their content, fall within the realm of the privilege cannot become privileged by merely attaching them to a communication with the attorney." <u>Sneider</u>, <u>supra</u>, 91 F.R.D. at 4. Accordingly, attachments which are "matters of public record or communications with outside parties . . . cannot be privileged because the requisite confidentiality does not exist. Similarly, attachments containing business, not legal information, cannot be privileged." <u>Id.</u>

The attorney-client privilege only protects communications which are intended to be confidential. The party asserting the privilege has the burden of showing that the communications in question were intended to be kept confidential. "'A mere showing that the communication was from client to attorney does not suffice, but the circumstances indicating the intention of secrecy must appear." <u>Winchester Capital Management Co. v. Manufacturers Hanover Trust Co.</u>, 144 F.R.D. 170, 174 (D. Mass. 1992) (quoting McCormick, Evidence § 91, pp. 187-88 (Cleary ed. 1972)).

Applying this principle, courts have "held that information which is to be communicated to the public or others is not privileged." <u>Id.</u> Similarly, "[d]ocuments which merely communicate information obtained from independent sources are not

49

protected by the attorney-client privilege." <u>Smith v. Conway Org., Inc.</u>, 154 F.R.D. 73, 78 (S.D.N.Y. 1994) (citing <u>Standard Chartered Bank PLC v. Ayala Int'l Holdings, Inc.</u>, 111 F.R.D. 76, 80 (S.D.N.Y. 1986)).  Further, documents prepared by non-attorneys and addressed to non-attorneys with copies routed to counsel are generally not privileged since they are not communications made "primarily for legal advice." <u>Sneider</u>, <u>supra</u>, 91 F.R.D. at 5 ("Funneling papers past corporate counsel will not shield the communications from disclosure").  <u>See also</u> <u>Simon</u>, <u>supra</u>, 816 F.2d at 403 ("business documents sent to corporate officers and employees, as well as the corporation's attorneys, do not become privileged automatically").

  <u>b. The Work Product Doctrine</u>

  The underlying principle of modern discovery is that "parties should be allowed to obtain 'the fullest possible knowledge of the issues and facts before trial.'" <u>LeBarron v. Haverhill Coop. Sch. Dist.</u>, 127 F.R.D. 38, 40 (D.N.H. 1989) (quoting 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2001, at 13); <u>see also</u> <u>Hickman v. Taylor</u>, 329 U.S. 495, 507 (1947) ("Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.").  However, "discovery, like all matters of procedure, has ultimate and necessary boundaries." <u>Hickman</u>, <u>supra</u>, 329 U.S. at 507.  Such

50

limitations come into play when a party's discovery requests "encroach[] upon the recognized domains of privilege." Id. at 508. One such area of privilege is that encompassed by the work product doctrine.

"At its core the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." United States v. Nobles, 422 U.S. 225, 238 (1975); see also In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1014 (1st Cir. 1988) (the work product doctrine gives attorneys "a zone of privacy within which to prepare the client's case and plan strategy, without undue interference"). The work product doctrine encompasses both "'opinion' work product and 'ordinary' work product--the former category encompassing materials that contain the mental impressions, conclusions, opinions or legal theories of an attorney, the latter category embracing the residue." Dupont Plaza Hotel, supra, 859 F.2d at 1014. The privilege afforded both types of work product is not absolute, but is instead a qualified privilege. Nobles, supra, 422 U.S. at 239.

The parameters of the work product doctrine and the requirements for overcoming it are set forth in Rule 26(b)(3), Fed. R. Civ. P., which states in pertinent part,

a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

The work product privilege embodied in Rule 26(b)(3) "is designed to balance the needs of the adversary system to promote an attorney's preparation in representing a client against society's general interest in revealing all true and material facts relevant to the resolution of a dispute." Loustalet v. Refco, Inc., 154 F.R.D. 243, 246 (C.D. Cal. 1993) (citing In re Subpoenas Duces Tecum, 738 F.2d 1367, 1371 (D.C. Cir. 1984)).

Thus, as set forth in Rule 26(b)(3), the work product doctrine encompasses (1) documents and other tangible things (2) which were prepared in anticipation of litigation or trial (3) by or for a party or by or for that party's representative.

### (1) Documents and Other Tangible Things

All of the items defendants claim to be privileged under the work product doctrine are documents. Accordingly, this element

52

does not provide a basis for disagreement over the doctrine's application in this action.

### (2)  Prepared in Anticipation of Litigation or Trial

The work product doctrine protects documents prepared in anticipation of litigation or trial.  A document satisfies this element of Rule 26(b)(3) "where 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'"  Martin v. Bally's Park Place Hotel and Casino, 983 F.2d 1252, 1258 (3d Cir. 1993) (quoting United States v. Rockwell Int'l, 897 F.2d 1255, 1266 (3d Cir. 1990) (quoting In re Grand Jury Proceedings, 604 F.2d 798, 803 (3d Cir. 1979))); accord Simon, supra, 816 F.2d at 401.

The party seeking to invoke Rule 26(b)(3)'s protection has the burden of establishing "that the sought-after documents were, in fact, prepared in anticipation of litigation." In re Perrier Bottled Water Litig., 138 F.R.D. 348, 352 (D. Conn. 1991) (citation omitted).

Although "[t]here is no requirement that the litigation have already commenced in order for the work-product doctrine to be operative, . . . there must be more than a remote possibility of litigation." Fox v. California Sierra Financial Servs., 120 F.R.D. 520, 524 (N.D. Cal. 1988) (citing Garfinkle v. Arcata

53

<u>Nat'l Corp.</u>, 64 F.R.D. 688, 690 (S.D.N.Y. 1974); <u>Panter v. Marshall Field & Co.</u>, 80 F.R.D. 718, 725 n.6 (N.D. Ill. 1978)). Otherwise stated, "there must be an identifiable prospect of litigation (i.e., specific claims that have already arisen) at the time the documents were prepared." <u>Id.</u> at 525 (citing <u>Burlington Indus. v. Exxon Corp.</u>, 65 F.R.D. 26, 42-43 (D. Md. 1974)); <u>see also</u> <u>Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC</u>, 5 F.3d 1508, 1515 (D.C. Cir. 1993) (the document must be "created 'with a specific claim supported by concrete facts which would likely lead to litigation in mind'" (quoting <u>Coastal States Gas Corp. v. Department of Energy</u>, 617 F.2d 854, 864 (D. C. Cir. 1980))).

It follows from the parameters described above that "'[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes'" are not protected under Rule 26(b)(3). <u>Martin v. Bally's Park Place Hotel</u>, <u>supra</u>, 983 F.2d at 1260 (quoting Fed. R. Civ. P. 26(b)(3) advisory committee note); <u>see also</u> <u>Linde Thomson</u>, <u>supra</u>, 5 F.3d at 1515; <u>Simon</u>, <u>supra</u>, 816 F.2d at 401; <u>Gerrits v. Brannen Banks of Florida</u>, 138 F.R.D. 574, 576 (D. Colo. 1991). This is true "'"even if the party is aware that the document may also be useful in the event of litigation."'" <u>Smith v. Conway Org.</u>, <u>supra</u>, 154 F.R.D. at 78 (quoting <u>Redvanly v. NYNEX Corp.</u>, 152 F.R.D. 460, 465 (S.D.N.Y.

54

1993) (quoting <u>Martin v. Valley Nat'l Bank</u>, 140 F.R.D. 291, 304 (S.D.N.Y. 1991))).

When a party or the party's attorney has an agent do work for it in anticipation of litigation, one way to ensure that such work will be protected under the work product doctrine is to provide "[c]larity of purpose in the engagement letter . . . ." <u>McEwen v. Digitran Sys., Inc.</u>, 155 F.R.D. 678, 683 (D. Utah 1994). Otherwise stated, "'[c]learly the most effective way to guard against inadvertent loss of the protection offered by the work product doctrine is to ensure that management's written authorization to proceed with the investigation identifies, as specifically as possible, the nature of the litigation that is anticipated.'" <u>Id.</u> at 683 n.6 (citing Richard H. Porter, *Voluntary Disclosures to Federal Agencies--Their Impact on the Ability of Corporations to Protect From Discovery Materials Developed During the Course of Internal Investigations*, 39 Cath. U.L. Rev. 1007, 1016 (1990)). An affidavit from counsel indicating that such work was done at his direction in anticipation of specified litigation will also help a party meet its burden under Rule 26(b)(3) of establishing that the work was done in anticipation of litigation. <u>See</u> <u>Martin v. Monfort, Inc.</u>, 150 F.R.D. 172, 173 (D. Colo. 1993).

c.  What Constitutes "Litigation" under Rule 26(b)(3)?

On the ancillary issue of whether work product undertaken in response to certain government investigations is protected from disclosure in the present case, the Supreme Court has answered this question affirmatively, stating that "the literal language of [Rule 26(b)(3)] protects materials prepared for *any* litigation or trial as long as they were prepared by or for a party to the subsequent litigation."  FTC v. Grolier, Inc., 462 U.S. 19, 25 (1983).

Although investigations by government agencies are not "litigation" as that term is generally understood, in the context of Rule 26(b)(3), however, courts recognize that "[i]nvestigation by a federal agency presents more than a remote prospect of future litigation, and provides reasonable grounds for anticipating litigation sufficient to trigger application of the work product doctrine."  Martin v. Monfort, Inc., supra, 150 F.R.D. at 173 (citing Kent Corp. v. NLRB, 530 F.2d 612, 623 (5th Cir.), cert. denied, 429 U.S. 920 (1976); In re LTV Securities Litig., 89 F.R.D. 595, 612 (N.D. Tex. 1981)).

d.  Prepared by or for a Party or by or for that Party's Representative

The work product doctrine encompasses documents prepared in anticipation of litigation or trial "by or for another party or

56

by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer or agent) . . . ." Rule 26(b)(3), Fed. R. Civ. P. This element of Rule 26(b)(3) reflects the fact that the work product doctrine

> is an intensely practical [doctrine],
> grounded in the realities of litigation in
> our adversary system. One of those realities
> is that attorneys often must rely on the
> assistance of investigators and other agents
> in the compilation of materials in
> preparation for trial. It is therefore
> necessary that the doctrine protect material
> prepared by agents for the attorney as well
> as those prepared by the attorney himself.

Nobles, supra, 422 U.S. at 238-39.

Under this provision, courts have held that studies conducted by a party at the direction of its attorney in anticipation of litigation fall within the scope of the work product doctrine, Martin v. Monfort, supra, 150 F.R.D. at 173, as do documents and reports prepared by agents of the attorney or the party he represents, Sprague v. Director, Office of Workers' Comp. Programs, 688 F.2d 862, 869-70 (1st Cir. 1982) (opinion letter prepared by expert at counsel's request as part of the counsel's preparation for an imminent lawsuit is protected under Rule 26(b)(3)); McEwen, supra, 155 F.R.D. at 683 ("materials produced by an accountant in anticipation of litigation and under the direction of an attorney are protected by work product immunity").

57

### e. Overcoming the Protection of the Work Product Doctrine

#### (1) Ordinary Work Product

Under Rule 26(b)(3), ordinary work product may be discovered "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."

#### (2) Opinion Work Product

Rule 26(b)(3) states that in ordering discovery of "ordinary" work product when the required showing has been made, "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." This provision has been interpreted by the Supreme Court as according "special protection to work product revealing the attorney's mental processes." Upjohn Co., supra, 449 U.S. at 400. Although the court declined to elaborate on what kind of a showing a party would have to make to obtain such work product in the course of discovery, it did note that "a far stronger showing of necessity and unavailability by other means" than that required to obtain "ordinary" work product is necessary to compel disclosure of "opinion" work product. Id., 449 U.S. at 401-02.

Despite the special protection afforded opinion work product, the First Circuit advises that "not every item which may reveal some inkling of a lawyer's mental impressions, conclusions, opinions, or legal theories is protected as opinion work product.  Were the doctrine to sweep so massively, the exception would hungrily swallow up the rule."  In re San Juan Dupont Plaza, supra, 859 F.2d at 1015.  Accordingly, the rule in this circuit is that "[w]hatever heightened protection may be conferred upon opinion work product, that level of protection is not triggered unless disclosure creates a real, nonspeculative danger of revealing the lawyer's thoughts."  Id.  Moreover, "[s]ome materials do not merit heightened protection because, despite the revelations they contain as to an attorney's thought processes, the lawyer has had no justifiable expectation that the mental impressions revealed by the materials will remain private."  Id. at 1015-16.

Upon review of the four documents or groups of documents whose court-ordered production is here challenged by the defendants, and in consideration of the legal principles hereinabove enunciated, the court finds and rules as follows:

(1) Document P-000016 is to be produced as per Magistrate Judge Muirhead's February 7, 1996, order.  Much of the information merely restates what is contained in the previously produced February 12, 1989, "Dear Valued Customer" letter.

59

(2) Documents P-000047-52 and P-000054-59 shall be produced in unredacted form as per the February 7 order.  Documents P-000041-45 are duplicates of documents P-000048-52 and, as such, their production is unnecessary.

(3) Documents 0069-73[22] shall be produced as per the February 7 order.  Documents 0074-77, bearing the date October 14, 1980, do not need to be produced in light of the court's ruling herein limiting the evidence in this matter to the years 1984 and forward.

(4) Document 4549[23] is to be produced.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

March 11, 1996

cc:  All Counsel

---

[22]The court notes that the documents identified by the defendants as 0069-77 correspondingly bear the Bates Stamp designations P-0100097-105.

[23]This document bears the Bates Stamp designation P-001007 and also appears as 4594 in the magistrate judge's order due to an apparent typographical error.

60